WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
AARON N. LUCOFF, IDAHO STATE BAR NO. 5707
HEATHER S. PATRICCO, WASHINGTON, D.C. BAR NO. 465883
ASSISTANTS UNITED STATES ATTORNEY
DISTRICT OF IDAHO
LAWRENCE SCHNEIDER, NEW YORK STATE BAR NO. 2594174
UNITED STATES DEPARTMENT OF JUSTICE TRIAL ATTORNEY
ATTORNEYS FOR THE UNITED STATES OF AMERICA
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FAZLIDDIN KURBANOV,<br><br>Defendant. | Case No. CR 13-00120-S-EJL<br><br>**GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY RE: EVAN KOHLMANN** |

The United States of America, by and through Wendy J. Olson, United States Attorney,

and the undersigned counsel, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and the

court's procedural order, files this revised notice of the government's intent to offer at trial the

expert testimony of Evan Kohlmann.  The government previously provided notice of its intent to

use Kohlmann as an expert witness.  *See* ECF No. 43.  Kohlmann's curriculum vitae is attached

to that notice.  This revised notice contains a summary of Kohlmann's trial testimony.

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 1

## LEGAL STANDARDS

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Supreme Court expounded on the application of Rule 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *United States v. Mohamud*, 2013 WL 71806, at *1. "The subject of expert testimony must be scientific knowledge which will assist the trier of fact to understand or determine a fact in issue." *Id.* (citing *Daubert* at 592). "The focus of the court's inquiry is on the expert's methodology, not on his conclusions." *Id.* (citing *Daubert* at 595).

"'Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *Id.* (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010)).

"Factors to be considered when determining if the testimony is reliable scientific knowledge are whether the theory or technique is generally accepted in the relevant scientific community, whether it has been subjected to peer review and publication, whether it can be and has been tested, whether standards exist to control the technique's operations, and whether the known or potential rate of error is acceptable. *Id.* (citing *Daubert*, 509 U.S. at 593–94). "The

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 2

inquiry, however, is a flexible one." *Id.* "Other relevant factors may be considered and the factors listed in *Daubert* may not be reasonable measures of the reliability of expert testimony in a particular case." *Id.* (citing *Daubert* at 594; *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147–153 (1999)). "The court's 'gatekeeping' obligation applies to technical and other specialized knowledge as well as scientific knowledge." Id. (citing *Kumho*, 526 U.S. at 147).

> Under *Daubert*, we must engage in a difficult, two-part analysis. First, we must determine nothing less than whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science." Second, we must ensure that the proposed expert testimony is "relevant to the task at hand," i.e., that it logically advances a material aspect of the proposing party's case. The Supreme Court referred to this second prong of the analysis as the "fit" requirement.

Id. (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.) (internal citations omitted), *cert. denied*, 516 U.S. 869 (1995)).

## KOHLMANN'S EXPERT WITNESS QUALIFICATIONS

Evan Kohlmann is a private international terrorism consultant who specializes in tracking contemporary terrorist movements. Kohlmann has researched terrorist organizations since approximately 1997. As part of his research, Kohlmann has interviewed known terrorist recruiters and organizers and attended underground conferences and rallies. He has reviewed thousands of open source documents. He has amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. He has personally developed computer software and database applications designed to draw out data contained in his digital collection and provide statistical trends and models to human analysts.

On twelve occasions, in jurisdictions outside the United States, Kohlmann has testified as an expert witness. In the United States, he has testified as an expert witness three times in civil

cases.  And he has testified as an expert witness in thirty-one criminal cases in United States federal and military courts.

Kohlmann's has been qualified as an expert witness in a number of federal criminal trials. *See, e.g., United States v. Kassir*, 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009) (provided expert opinion on history of al-Qaeda); *United States v. Paracha*, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3 2006) (same); *United States v. Ali*, 2011 WL 4583826, at *5-6 (D.Minn. Sept. 30, 2011) (expert opinion on al-Shabaab official website and their propaganda, messaging and connection with al-Qaeda); *United States v. Amawi*, 695 F.3d 457, 478-79 (6th Cir. 2012) (citing district court decision that Kohlmann qualified as expert about how and why terrorists use internet to disseminate videos); *United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (upholding district court decision that Kohlmann qualified as expert on various aspects of trend of decentralized terrorism and homegrown terrorism); *United States v. Subasic*, 568 F. App'x 234, 235 (4th Cir. 2014) *cert. denied*, No. 14-7708, 2015 WL 732141 (U.S. Feb. 23, 2015) (expert testimony about extremism) (unpublished).  Courts have upheld Kohlmann's methodologies, including his reliance on secondary sources.  *See, e.g., United States v. Mohamud*, 2013 WL 71806, at *6 (D.Or. Jan. 4, 2013); *Kasir*, 2009 WL 910767, at *7; *Paracha*, 2006 WL 12768, at *20.

In *United States v. Abu Ghayth*, 2014 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014), the district court denied the defendant's motion to Kohlmann's expert testimony concerning the history and structure of al Qaeda.  The court found:

> First, Kohlmann's proposed testimony would assist the jury in understanding how al Qaeda-to which the defendant allegedly has provided material assistance-operates.  Understanding how it recruits and trains its members is important to understanding the defendant's alleged role in that process.  Contrary to the defendant's claim, jurors are unlikely to have amassed a thorough

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 4

and accurate understanding of al Qaeda from news and other sources that would enable them to make sense of the evidence absent some testimony to place it in context.

Second, Kohlmann is qualified under Rule 702. He has been qualified to testify in twenty-five federal criminal trials. The Court has considered the transcript of a full-day *Daubert* hearing in *United States v. Paracha*, in which another judge of this court focused deeply on Kohlmann's experience, training, education, and methodology, and determined that Rule 702 was satisfied. The Second Circuit upheld that determination, and this Court agrees with the *Paracha* court's findings.

Third, Kohlmann's proposed testimony would be relevant to understanding the nature of the conspiracy that the defendant allegedly joined, the identity of the conspiracy's other participants, and the extent, if any, to which the defendant's words and actions constituted provision of material support or resources to terrorists.

Fourth, Kohlmann's proposed testimony would not be unduly prejudicial due to his reliance in part on hearsay or for any other reason. An expert witness may "rely upon hearsay as to such matters as the structure and operation rules of organized crime [groups]" where other experts in the field would reasonably rely on such hearsay. This is the case here. To the extent that the defendant is concerned that Kohlmann will testify about irrelevant al Qaeda members, characteristics, or actions and that such testimony will prejudice him, he may object to that testimony at trial.

*Abu Ghayth*, at *1 (footnotes omitted).

In *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 331-32 (E.D.N.Y. 2013), the district court found

Mr. Kohlmann is qualified to offer his opinions regarding the attribution of terror attacks to Hamas in this case. It is not fatal to his testimony that his research was conducted solely on the Internet. Mr. Kohlmann has demonstrated the reliability of his methodology: he reviews videos, recordings, or published writings of terrorists; terrorist organizations' official websites; newspaper articles, television news reports, and reputable books and magazines. He synthesizes this material and pulls together common themes in reaching his conclusions. Any challenges to his methodology are more appropriately raised on cross-examination, as the evidence meets the tests of admissibility. Mr.

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 5

> Kohlmann's testimony, including his expert analysis of materials that might otherwise be inadmissible hearsay, will help the jury understand the terror attacks at issue in this case.

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d at 331-32 (citations omitted).

In this case, Kohlmann was contracted by the United States Attorney's Office for the District of Idaho to review various evidentiary materials, including but not limited to:  the preserved contents of hard drives seized from the defendant, communications involving the defendant, transcripts of conversations between the defendant and a confidential human source, and a transcript of the defendant's post-arrest interview with the FBI, in order to determine the relevance of these materials to terrorist activity and/or international terrorist organizations, to include the Islamic Movement of Uzbekistan (IMU).  Kohlmann was paid by the government for his work on this case.  Kohlmann's report will be provided to the defense in discovery.

## SUMMARY OF KOHLMANN'S TRIAL TESTIMONY

The essence of Kohlmann's testimony will relate to how the defendant was recruited by the IMU, how the defendant conspired, and attempted, to provide material support and resources to the IMU, and how the defendant's material support and resources would have assisted the IMU.

Kohlmann will testify about the defendant's extensive familiarity with the leadership, history and mission of the IMU and allied militant groups.  Kohlmann will provide background information about the IMU's formation, history, activities and leadership.  He will also distinguish between the Afghan and Pakistani Taliban, and the relationship between the IMU, the Islamic Jihad Union (IJU) and the Pakistani Taliban.  He will explain why the IMU would be interested in attacking the United States.  Based on the defendant's recorded conversations, Kohlmann will opine that the defendant clearly understood that the IMU had an established

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 6

relationship with other designated international terrorist organizations, including the Pakistani Taliban and Al-Qaeda, and the general nature of that relationship.

Kohlmann will testify about the IMU's official, independent media wing known as "Jundullah Studios." Since 2001, Jundullah produced dozens of IMU propaganda videos containing exclusive video footage of IMU leaders, meetings with representatives of other allied groups and combat footage along the Afghan-Pakistani border (including suicide bombings) from attacks targeting NATO, Afghan and Pakistani army forces. Kohlmann will explain that this material's value is that it communicates to potential terrorist recruits the general aims and ideology of a given group to a wide, global audience; it further communicates specific instructions and guidance on the use of preferred military tactics such as assassinations, kidnappings and suicide bombings; and it fosters a sense of organization and purpose for isolated extremists living in outside countries. It also is an essential part of fund-raising and soliciting potential donors. In an effort to boost overseas recruitment, Jundullah has also featured cameo appearances by visiting foreign fighters from western countries. Between 2009 and 2013, Jundullah's videos were made available to download via links posted on various jihadi forums and/or Jundullah's official internet website http://furqon.com.

Kohlmann will discuss the defendant's persistent interest in furqon.com and Jundullah's videos. Google Chrome browser records stored on one of the defendant's computer hard drives indicate as many as 146 separate web visits to various content hosted on furqon.com, including three visits to the Jundullah Studios video download library, an additional visit to an archive of Afghan Taliban media hosted on furqon.com, two visits to the library of IMU-authored books available for download on the site, and four visits to an IMU text communiqué supporting revenge attacks on the U.S. in response to the video "Innocence of Muslims." Kohlmann will

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 7

reference the defendant's numerous statements throughout the investigation about his repeated visits to furqon.com.

Kohlmann will discuss a sampling of several IMU propaganda video series made available for download via furqon.com, which were either found on the defendant's seized media, viewed by the defendant or discussed by the defendant during the investigation. These series, detailed in Kohlmanns's report, include: the "Jihad in Afghanistan" series; the "What's Happening in the Tribal Areas" series; suicide bombing videos entitled "Martyr Abdulaziz," "Abdulmalik Fidoiy," and "Ali Mergan Fidoiy;" "Frohe Bohtschaft Pakistan" ("Glad Tidings from Pakistan"); "Er Kam, Sah Und Siegte!" ("He came, He saw, He conquered!"); "Soldaten Allahs" ("Soldiers of God"); "Usoma" (video tribute to Bin Laden); "Ansorlar" (video tribute to the Pakistani Taliban); the "Josus Killer" ("Spy Killer") series; a video sermon featuring IMU spiritual leader Mufti Abu Zar al-Pakistani; "Jihod Bayroghi" ("Flag of Jihad"); and the "Tema Mujahida" ("The Mujahid") series. Kohlmann will discuss the videos' purpose and role in IMU's efforts. Kohlmann will testify that, "[t]aken together, the collection of videos found in various media seized in the present case represents the single largest cache of IMU propaganda I have ever seen in a federal criminal case filed in a U.S. court." He will testify about how certain of the defendant's recorded conversations demonstrate his knowledge of specific propaganda videos. Kohlmann will testify about the significance of the defendant having so much IMU propaganda in his possession. Kohlmann will discuss the value of these, and other, media in IMU's recruitment of prospective members. Kohlmann may also be asked to opine on the nature of other media, such as videos, photos, screenshots and URL's[1], seized from the defendant.

---

[1] "URL" stands for "Uniform Resource Locator," and is used to specify addresses on the World Wide Web. A URL is the fundamental network identification for any resource connected to the

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 8

Kohlmann will testify about the contemporary recruitment patterns of transnational jihadist organizations.  This testimony will include a discussion of how these jihadist organizations began using the internet as a primary means of communication and media distribution, including using the internet to attract recruits or donors to the cause and as a medium for two-way, private and anonymous communication with such prospective individuals. To facilitate the process, these groups have created public email accounts, dot-com websites, chat forums, and channels hosted on YouTube.  Evidence from the defendant's seized media shows dozens of internet search queries and web visits related to purchasing, fabricating and/or training with firearms and explosives.

Kohlmann will further testify that online videos have a particularly viral impact in helping to establish the reputation and agenda of a given group.  This material is likely to be useful to someone trying to join the IMU as it communicates the general aims and ideology of groups like the IMU to a global audience; it further communicates specific instructions and guidance on the use of tactics such as assassinations, kidnappings and suicide bombings; it fosters a sense of organization and purpose for isolated extremists living in western countries who are drawn towards joining jihadist groups; and it encourages even those who have no direct connection to jihadist organizations to join their cause.  Although jihadi supporters are sometimes encouraged to carry out "lone wolf" missions, according to a senior Al-Qaida official, "the general advice is:  he who can communicate with the mujahideen leadership, and who knows from them what they want and should be done, and who offers them what he has of ideas and plans and information and such; this is better."  For those who are sufficiently motivated by

---

web (e.g., hypertext pages, images, and sound files).  URLs have the following format: protocol://hostname/other_information.

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 9

jihadi propaganda to take action and join the cause, the next step in the process would be to establish direct contact with an online representative or a recruiter for a given organization.

Kohlmann will testify about the defendant's online communications with IMU's furqon.com website administrator "Ahmad" (a.k.a. "ahmadi9777"). Based on his training and experience, Kohlmann will opine that these communications are typical of the types of communications between a jihadist organization recruiter and a recruit. He will explain why that is his opinion. Kohlmann will interpret the meaning of several communications between ahmadi9777 and the defendant, including language coding and several terms and phrases used by the defendant and ahmadi9777. Based on the evidence reviewed by Kohlmann, as well as his training, background and experience, he will explain the evidence that he identified supporting his conclusion that the defendant was talking with an IMU recruiter about providing material support to the IMU. Kohlmann will compare this evidence with other cases where suspects or defendants spoke with jihadi organization recruiters. Kohlmann will explain where the defendant was in the recruitment process.

Kohlmann will explain the role of the "pledge" in jihadist organizations and how the "pledge" can be made. He will also explain why a jihadist recruit would not need to travel overseas to conduct a simplistic, "lone wolf" attack aimed at a "soft" target. Kohlmann will contrast this with the process a recruit would need to go through before conducting a highly-complex, mass casualty terrorist attack.

Kohlmann will explain the significance of online financing to jihadist organizations, such as the IMU. He will explain what evidence he identified that supported the conclusion that the defendant and ahmadi9777 communicated about helping finance the IMU. He will explain how the defendant and ahmadi9777's online financing plans were similar to other jihadist

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 10

organizations online financing.  Kohlmann will explain that, while the money amounts discussed between the defendant and ahmadi9777 may seem rather modest from a western perspective, in the context of the Pakistan conflict, these donations can be the difference between an IMU militant having a weapon or else entering the battlefield empty-handed.  He will explain that donations of this scale are also much easier to mass-solicit over the internet, and it is far less likely that individual financial transfers in the low hundreds of dollars will attract government scrutiny.

Based on the evidence reviewed, Kohlmann will conclude that the defendant repeatedly expressed sympathy for the goals and aims of the IMU, an antipathy towards its enemies (including the United States), and an interest in providing support to the movement.  The defendant collected and consumed a vast quantity of official IMU propaganda, and from his discussions with a CHS, demonstrated an intimate familiarity with its content.

Kohlmann will opine that the evidence shows how the defendant investigated at length multiple avenues to provide support to the IMU, including providing financial and technical assistance, as well as carrying out an actual attack on its behalf.  While viewing extremist videos or a terrorist website alone is not necessarily indicative of ill intent, the defendant initiated sustained direct contact with IMU and IJU representatives.  Based on his own research, Kohlmann is unfamiliar with any other individual living in the United States who has succeeded in persistent online communication with the IMU.  These facts, according to Kohlmann, would tend to suggest that the defendant's interest in these groups was not merely the result of casual websurfing or idle curiosity.

Nor is it necessarily unusual, Kohlmann will opine, that someone seeking to participate in violent jihad would openly advertise that fact in online social media postings, as the defendant

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 11

did in this case.  In Kohlmann's experience as a consultant working with law enforcement in the United States and other western countries, it is quite common for law enforcement agents to identify "lone wolf" terrorist threats based on their social media posts.  For isolated individuals who are living in communities with few fellow jihadists, advertising on the internet can serve as a means of last resort to make some sort of meaningful outside contact.

**CONCLUSION**

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and the court's procedural order, the government provides this revised notice of Evan Kohlmann's expert testimony.  The government may supplement this expert notice if necessary.

Respectfully submitted this 3rd day of April, 2015.

WENDY J. OLSON
UNITED STATES ATTORNEY
By:

*/s/ Aaron Lucoff*_____
AARON N. LUCOFF
Assistant United States Attorney

/s/_____
HEATHER S. PATRICCO
Assistant United States Attorney

/s/_____
LAWRENCE SCHNEIDER
U.S. Department of Justice Trial Attorney
Counterterrorism Section

GOVERNMENT'S REVISED SECOND NOTICE OF EXPERT TESTIMONY - 12

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2015, the foregoing **GOVERNMENT'S**

**REVISED SECOND NOTICE OF EXPERT TESTIMONY** was electronically filed with the

Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the

following person(s):

Chuck Peterson
chuck@petersonlawyers.com

Courtney Peterson
courtney@petersonlawyers.com

/s/_____
Aaron Lucoff